# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------X

Larry A. Rosenmann, on behalf
of himself and all others similarly
situated,

                Plaintiff,

vs.

Lernout & Hauspie Speech
Products NV and Gaston Bastiaens,

                Defendants.

---------------------------------------------------X

Case No.:

**CLASS ACTION
COMPLAINT FOR
VIOLATIONS
OF FEDERAL
SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# 00-11669PBS

Plaintiff, on behalf of himself and all others similarly situated, for his complaint against

defendants, alleges the following based upon the investigation of plaintiff's counsel, which

included a review of Securities Exchange Commission filings of Lernout & Hauspie Speech

Products NV, securities analysts' reports, press releases issued by defendants, media articles, and

other investigatory efforts.  It is believed that substantial evidentiary support will exist for the

allegations contained in this class action complaint after a reasonable opportunity for discovery.

## SUMMARY OF THE CASE

1.      This is a class action brought on behalf of plaintiff and all other persons, other

than defendants and their affiliates, who purchased the common stock of defendant Lernout &

Hauspie Speech Products NV ("L&H" or the "Company") during the period of December 28,

1999, through August 7, 2000, inclusive (the "Class Period"), and who sustained damage as a

result of those purchases (the "Class").  On behalf of himself and the members of the Class,

plaintiff seeks to recover damages caused by defendants' violations of Sections 10(b) and 20(a)

DOCKETED



of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated by the SEC pursuant to the Exchange Act.

2.     During the Class Period, defendants materially misrepresented L&H's financial condition by making false statements regarding the Company's Korean business and the amount of sales in that sector.

## JURISDICTION AND VENUE

3.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a); and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act. This court has jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and under Sections 1331 and 1337 of the Judicial Code, 28 U.S.C. §§ 1331, 1337.

4.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b).  The wrongs alleged occurred in part in this district, including the offer and sale of securities and the preparation and dissemination to the investing public of false and/or misleading information.

5.     In connection with the acts and conduct alleged in this complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including interstate telephone facilities, the United States mail, and the facilities of a national stock exchange to accomplish its wrongdoing.

## THE PARTIES

6.     Plaintiff Larry A. Rosenmann purchased shares of L&H common stock during the Class Period, as set forth in his certification attached to this complaint, and was damaged by his purchase of these shares.

-2-

7.      Defendant Lernout & Hauspie Speech Products NV is a Belgian company with its principal place of business in Belgium.  The common stock of L&H trades on the NASDAQ National Market System under the trading symbol LHSP.  It was traded in an efficient market at all times during the Class Period.  L&H is a speech-recognition software firm.  L&H Korea is the Korean unit of L&H.  L&H Korea is at the center of the controversy because of the sharply increasing sales reported by L&H for that unit.

8.      Defendant Gaston Bastiaens ("Bastiaens") is President and Chief Executive Officer of L&H.  In June 2000, he became a member of L&H's Board of Directors.  Bastiaens provides information for L&H's press releases and has been a distributor of L&H's and L&H Korea's earnings and contract figures.  Bastiaens also signed the Company's Forms 10-K for the period ended December 31, 1999 and Form 10Q for the period ended March 31, 2000, filed with the SC on June 30, 2000.  Because of his positions, Bastiaens knew that these figures were grossly inaccurate via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations), conversations and contacts with other corporate officers and employees, attendance at management and Board of Directors meetings and its committees, and via reports and other information provided to him in connection with the operations of the Company.

## CONTROLLING PERSON

9.      Bastiaens, by reason of his executive and board position, was a controlling person of L&H during the Class Period and had the power and influence, and exercised the same, to cause the Company to engage in the conduct described in this complaint.

-3-

10.     During the Class Period, Bastiaens occupied a position that made him privy to non-public information concerning L&H.  Because of this access, he knew of the adverse material facts specified in this complaint and knew that they were being concealed.

11.     Bastiaens is liable for making false and misleading statements, and/or for wilfully participating in a scheme and course of business that operated as a fraud on purchasers of L&H common stock and damaged members of the Class in violation of the federal securities laws. The defendants pursued a common goal, i.e., to artificially inflate the price of L&H common stock by making false and misleading statements and concealing material adverse information. The scheme and course of business was designed to and did: (1) deceive the investing public, including plaintiff and other Class members; (2) artificially inflate the price of L&H common stock during the Class Period; and (3) cause plaintiff and other members of the Class to purchase L&H common stock at inflated prices and to sustain damages.

12.     Bastiaens had the opportunity to commit and participate in the violations of the federal securities laws as described in this complaint.  He was a top officer and a member of the Board of Directors of L&H, and he controlled its press releases, corporate reports, SEC filings and communications with analysts.  Thus, Bastiaens controlled the public dissemination of, and could misrepresent, the information about L&H's business, products and finances, and specifically relating to its Korean business, that reached the public and caused the inflation in the price of L&H's common stock.

## CLASS ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons who purchased the common stock of L&H during the period December 28, 1999, through August 7, 2000, inclusive.  Excluded from the Class are defendants, members of the immediate families of Bastiaens, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

14.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were approximately 142 million shares of L&H common stock outstanding and approximately 240 million shares were traded on the NASDAQ. Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ.  While the exact number of Class members can only be determined by appropriate discovery, plaintiff believes that the Class members number at least in the thousands and that they are geographically disbursed throughout the United States.  Record owners and members of the Class may be identified from the records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice customarily used in federal securities actions.

15.     Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and all Class members purchased shares of common stock of L&H during the Class Period in an artificially inflated market and sustained injury as a result.  Plaintiff and each member of the Class relied on the integrity of the market for L&H stock in making those purchases.

-5-

16.     Plaintiff will fairly and adequately protect the interests of the Class members and
has retained counsel who are experienced and competent in class and securities litigation.
Plaintiff has no interests that are contrary to or in conflict with members of the Class plaintiff
seeks to represent.

17.     A class action is superior to all other available methods of fair and efficient
adjudication of this controversy since joinder of all Class members is impracticable.
Furthermore, as the damages suffered by individual members of the Class may be relatively
small, the expense and burden of individual litigation make it impossible for the members of the
Class to individually address the wrongs done to them.  There will be no difficulty in the
management of this class action.

18.     Common questions of law and fact exist as to all members of the Class and these
common questions predominate over any questions affecting solely individual members of the
Class because defendants have acted on grounds generally applicable to the entire Class.  Among
the questions of law and fact common to the Class are:

1.     Whether the federal securities law were violated by defendants' acts as
alleged in this complaint;

2.     Whether the Company's and Bastiaens' publicly disseminated releases and
statements during the Class Period omitted and/or misrepresented material facts
and whether defendants breached any duty to convey material facts or to correct
material facts previously disseminated;

3.     Whether defendants participated in and pursued the fraudulent scheme and
common course of business complained of;

4.      Whether defendants acted wilfully and/or recklessly in omitting and/or misrepresenting material facts;

5.      Whether the market prices of L&H common stock during the Class Period were artificially inflated due to the material omissions and/or misrepresentations as stated in this complaint;

6.      Whether the members of the Class have sustained damages and, if so, the extent and measure of damages sustained by the Class.

## SUBSTANTIVE ALLEGATIONS

### Background of L&H's Business

19.      L&H is a speech recognition software company.  L&H provides advanced speech and language solutions for vertical markets, computers, automobiles, telecommunications, embedded products, consumer goods and the Internet.  The Company makes the speech user interface for interaction between humans and technology and uses advanced translation technology to overcome language barriers.  Products and services include automatic speech recognition (ASR), text-to-speech (TTS), digital speech and music compression (SMC) and text-to-text (translation).  These services and products are marketed for customized solutions for corporations, core speech technologies marketed to OEMs, end user and retail applications for continuous speech products in horizontal and vertical markets, document creation, human and machine translation services, Internet translation offerings and linguistic tools.  The Company recently acquired two U.S. companies, Dictaphone Corporation and Dragon Systems, and has offices in more than 40 countries in Europe, Asia, the Middle East, North America and South America.  L&H's Korean unit is L&H Korea.

20.     On September 13, 1999, L&H announced its acquisition of Bumil Information &
Communications, Ltd. ("Bumil"), a leading developer of interactive voice, call center and other
telecommunications market applications in Korea.  This acquisition would enable L&H to
expand its telecommunications application development expertise in the Pacific.  The press
release stated that:

> This acquisition of Bumil builds on L&H's already significant presence
> and resources in the Asia and helps position it for the leadership position
> there.

Defendant Bastiaens stated:

> Bumil has leveraged its management and development expertise and
> business relationships to become a leader in the Pacific Rim in the creation
> and deployment of speech-enabled solutions for the burgeoning
> telecommunications industry.  By combining Bumil's thriving business
> with L&H's vision and expertise, I am convinced we can continue to build
> a highly successful Korean and Asia Pacific operation.

**Defendants' Materially False and Misleading Statements during the Class Period**

21.     On December 28, 1999, defendants announced several agreements with "industry-
leading" companies in Asia and Europe.  With regard to those agreements, Bastiaens stated:

> The agreements announced today affirm our belief that speech and
> language technologies can serve as a primary interface for information
> gretrieval, enhanced communication and value-added services.  L&H's
> ability to offer the right solution, on the correct platform, in the desired
> language, continues to drive worldwide sales.  Because of these strengths,
> the company expects a surge in its telecom and enterprise solution revenue
> for 2000 and beyond.

The press release further emphasized the market potential for L&H, stating:

-8-

**Asia Pacific Region Sees Strong Demand**

L&H cited strong demand for its speech and language technologies and solutions in the Asia Pacific region, especially South Korea. Among the solutions provided are dialogue systems that provide customers with a fast, simple and convenient way to access information, as well as embedded speech engines and language technologies. The signed contracts include:

•**Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities**, along with more than 10 other securities companies, have selected L&H to develop client server solutions for on-line trading and automated dialogue systems that allow securities customers to receive stock quotes and trade.

1.       Following the signing of these contracts, L&H announced on January 31, 2000 that it had signed a multi-year agreement with Hung Chang Co., Ltd., a telecommunications technology leader based in Seoul, under which L&H was to license its "speech technologies in multiple languages to develop speaker verification and reservation applications." In this press release, Bastiaens stated:

> Our ever-increasing successes in the Korean market, particularly within the telecommunications sector, are the result of a very well developed and implemented strategy to build a worldwide enterprise and telephony solutions market presence. These successes will help us to shortly create a separate business group for that industry.

22.                    On February 9, 2000, defendants announced record 1999 fourth quarter "revenues of $110 million, or a 43.5% increase in the reported revenue of $76.7 million for the fourth quarter 1998. For the fiscal 1999, the company reported total revenues of $344 million or an increase of 62.7% over the reported revenues of $211.6 million for 1998." Bastiaens stated in the press release that:

> In 1999 we experienced a strong demand for speech and language technologies, applications and solutions, specifically in the Enterprise and Telephony arena. This increase was mainly the result of internal growth and created a positive cash flow from operations of $68 million, reflecting

the maturity of our operations.  During 2000 I believe we will reap the
benefits of these changes as we plan to launch separate entities for
Healthcare, Internet Translation and Globalization, Enterprise and
Telephony Solutions.  We foresee L&H's technologies will provide an
intuitive speech user interface for the ever growing number of wireless,
portable and handheld devices.

Defendants provided further favorable information of the growing strength of its South Korean

business, stating:

> During the fourth quarter, L&H's Technologies and Solutions Division
> continued its rapid growth in the Pacific Rim area, signing numerous
> contracts with high-profile Pac Rim-based developers.
>
> * * * *
>
> The demand for speech-enabled applications continued to grow in the
> Pacific Rim and L&H technologies were increasingly popular in the
> region.  South Korean- and other Pac Rim-based developers who plan to
> build applications employing L&H's RealSpeak, ASR, TTS and dialogue
> systems solutions include: Hyundai Securities, Samsung Securities, LG
> Securities, Daishin Securities and Daewoo Securities, EPC Asia, IBCC
> (International Business Computer Co., Ltd.) NeoTelecom, LG Electronics,
> Intelligent Communications, Softech Advantage, and Softel
> Telecommunications Pte Limited.
>
> * * * *
>
> L&H enhanced its ability to develop telephony solutions, increased its
> presence in Korea and continued to expand its telecommunications
> leadership by acquiring resources that included Bumil Information &
> Communications, Ltd. of Seoul Korea and others.

23.     On May 9, 2000, defendants issued a press release announcing L&H's purported

record revenues and strong earnings for first quarter of 2000.  L&H announced that earnings per

share had risen to $0.19 before exceptional items from $0.12 in 1999.  The Company again stated

that it had "signed a number of contracts in its key markets, created strategic alliances and

introduced prototype technologies."

-10-

24.     L&H's Korean revenues grew to approximately $59 million for the first quarter of 2000, from $97,000 in 1999, to account for more than half of L&H's total reported revenues of $110.7 million.  Notably, its revenues from every other geographic area declined from the 1999 levels.

25.     On May 19, 2000 in an interview with CBSMarketWatch.com, Bastiaens listed the names of about a dozen Korean customers with which L&H did business and the dollar amount of business done with those and other customers.

26.     Shortly thereafter, on May 24, 2000, L&H released "Lernout & Hauspie Frequently Asked Questions, Q1 2000" on its website – www.lhsl.com.  L&H identitied some of the customers with which L&H entered into contracts during the first quarter of 2000.  For its Technology and Solutions Division, companies with which the Company had signed new contracts included Hung Chang Co., Ltd., MailCall, Intervoice Bright & OneBox, SystemSoft, and BeVocal.

27.     On June 30, 2000, L&H filed its Form 10K for 1999 and Form 10-Q for the first quarter of 2000, which contained the false revenue figures for L&H's Korean business.  Bastiaens signed both of these documents which disclosed that L&H's sales in Korea were the main reason for the increased revenues in 1999 and the first quarter of 2000.  In every other market sales fell in the first quarter of 2000.

28.     On July 18, 2000, defendants announced that they entered a binding memorandum of understanding to form an alliance with SK Corporation to jointly develop and market voice portal and interactive voice response services for Korea.  In their release, defendants stated that, "during the past several quarters, L&H has experienced strong demand for its speech and language technologies and solutions in Asia, particularly among telecommunications, financial

-11-

service and Internet-related service vendors." The press release further stated that the alliance "is expected to further extend L&H's already significant leadership position in the Asian market as well as in the voice for Web and voice portal industry."

29.     On July 31, 2000, defendants issued a press release announcing that it "builds on its successes in Korea" and announcing more contracts with Korean voice-for-Web providers. In the release, Bastiaens stated:

> Our business in Korea is very successful as evidenced by today's announcements, our other recent wins in that region and our strong revenues. We are quite pleased with our business model in Korea and the successes it has brought in our key markets, including telephony, enterprise solutions and voice-for-Web Solutions. As we further roll out our voice-for-Web strategy worldwide, we intend to employ our Korean business model. We are also planning to implement our Korean business model to expand our enterprise and telephony activities worldwide.

30.     On August 8, 2000, the "Heard on the Street" column in *The Wall Street Journal* exposed the false revenue-reporting practices of defendants in an article which stated, *inter alia*, that:

(a)     a number of companies identified by L&H as Korean customers were not customers or their reported patronage levels were inflated;

(b)     Samsung Securities officials, including spokesman Shin Dong Woo, said that Samsung never made any purchases from L&H;

(c)     LG Electronics, through Yu Won UK, stated that it never bought products or licenses from L&H;

(d)     Hyundai Securities' purchases from L&H were only just over $1 million and Hanvit Bank signed a contract with L&H valued at $150,000, not the combined $5-$10 million in revenue identified by Bastiaens; and

-12-

(e)   L&H products were not purchased by Hung Chang Co., but by Spia Co., of which L&H is the largest investor.

31.   The price of L&H common stock plunged from a close of $37 on August 7, 2000 to open at $29-1/2 on August 8, 2000.  After the August 8, 2000 *Wall Street Journal* article, the stock again fell and closed at $26.75 on August 8, 2000.  On August 8, 2000, plaintiff sold his L&H stock for a loss of $6,875.00.

32.   The statements made by defendants, as set forth in paragraphs 20 through 31 above, were false and misleading because defendants knew or were reckless in not knowing, based on information available to them concerning L&H's business in Korea, that its reported revenues from that business were false, as set forth in paragraph 31 herein.

## L&H's Financial Statements during the Class Period Were Materially False and Misleading

33.   Defendants represented, during the Class Period, that L&H's financial statements for the quarters ended December 31, 1999, March 31, 2000 and June 30, 2000 were prepared in accordance with GAAP.  These representations were materially false and misleading when made because L&H employed improper accounting practices which caused its reported financial statements not to be in conformity with GAAP and artificially inflated the Company's reported operating results, and failed to disclose the significant risks and procedures for timely and accurately recording and reporting the Company's uncertainties associated with its accounts receivable, as alleged herein.

34.   GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements

-13-

filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

35.     As a result of the foregoing, L&H's financial statements for the quarters ending December 31, 1999, March 31, 2000 and June 30, 2000 concealed the truth concerning the Company's business, operations, and financial performance to the detriment of unsuspecting investors. In addition to the accounting improprieties noted above, L&H presented its Financial Statements in a manner which also violated at least the following provisions of GAAP:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

-14-

(c)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

(d)     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts  Statement No. 1, ¶ 42);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is

to try to ensure that what is reported represents what it purports to represent
(Concepts Statement No. 2, ¶¶ 95, 97).

**Undisclosed Adverse Information**

36.     The market for L&H's common stock was open, well-developed and efficient at
all relevant times.  As a result of the materially false and misleading statements and failures to
disclose certain information, L&H's common stock traded at artificially inflated prices during the
class period.  The artificial inflation continued until the time L&H's overstatement of the value of
its Korean contracts was exposed by the August 8, 2000 Wall Street Journal article.  Plaintiff and
other members of the Class purchased or otherwise acquired L&H common stock relying upon
the integrity of the market price of L&H's common stock and market information relating to
L&H and have been damaged as a result.

37.     During the Class Period, defendants materially misled the investing public,
thereby inflating the price of L&H's common stock, by publicly issuing false and misleading
statements and omitting to disclose material facts necessary to make defendants' statements not
false and not misleading.  These statements and omissions were materially false and misleading
in that they failed to disclose material adverse information and misrepresented the truth about
L&H, its business and its operations: defendants knew or recklessly disregarded, prior to August
8, 2000, that the values of certain contracts had not been accurately reported to the investing
public.  According to information obtained by *The Wall Street Journal*, sales to Korean entities
were materially less than previously suggested.  When the truth about the sales in Korea was
published, the share price of L&H stock dropped dramatically.

38.     At all relevant times, the material misrepresentations and omissions particularized
in this Complaint directly or proximately caused or were a substantial contributing cause of the

-16-

damages sustained by plaintiff and other members of the Class.  As detailed above, during the

Class Period, defendants made or caused to be made a series of materially false or misleading

statements about L&H's business, prospects and operations, particularly in Korea.  These

material misstatements and omissions had the cause and effect of creating in the market an

unrealistically positive assessment of L&H and its business, prospects and operations, thus

causing the Company's common stock to be overvalued and artificially inflated at all relevant

times.  Defendants' materially false and misleading statements during the Class Period resulted in

plaintiff and other members of the Class purchasing the Company's common stock at artificially

inflated prices, thus causing damages.

## NO SAFE HARBOR

39.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements alleged in this complaint.

Many of the specific statements pleaded were not identified as "forward-looking statements"

when made.  To the extent there were any forward-looking statements identified as such, there

were no meaningful cautionary statements identifying important factors that could cause actual

results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does not apply to any forward looking

statement pleaded, defendants are liable for those false forward-looking statements because at the

time each of those statements were made, the particular speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or

approved by an executive officer of L&H who knew that those statements were false when made.

Furthermore, as stated above, many of the misrepresentations related to historical facts.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

-17-

## FRAUD-ON-THE-MARKET DOCTRINE

40.     At all relevant times, the market for L&H common stock was an efficient market

for the following noninclusive reasons:

> 1.     L&H's common stock met the requirements for listing, and was listed and
>
> actively traded on the NASDAQ, a highly efficient and automated market;
>
> 2.     As a regulated issuer, L&H filed periodic public reports with the SEC and
>
> NASDAQ;
>
> 3.     L&H regularly communicated with public investors via established market
>
> communication mechanisms, including regular disseminations of press releases on
>
> the national circuits of major news wire services and other wide-ranging public
>
> disclosures, such as communications with the financial press, conference calls,
>
> and other similar reporting services; and
>
> 4.     L&H was followed by several securities analysts employed by major
>
> brokerage firms who wrote reports which were distributed to the sales force and
>
> certain customers of their respective brokerage firms.  Each of these reports was
>
> publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for L&H's stock promptly digested

current information regarding the Company from all publicly available sources and reflected

such information in L&H's stock price.  Under these circumstances, all purchasers of L&H

common stock during the Class Period suffered similar injury through their purchase of L&H's

common stock at artificially inflated prices and a presumption of reliance applies.

## SCIENTER ALLEGATIONS.

43.     Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth above in detail, Bastiaens, by virtue of his receipt of information obtained from his in-depth evaluations of the Company's business, his control over and receipt of L&H's allegedly materially misleading misstatements and/or his associations with the Company which made him privy to confidential proprietary information concerning L&H, participated in the fraudulent scheme. In additional, Bastiaens was the person who provided *The Wall Street Journal* with the identity of L&H's purported Korean customers and the amount of purported revenues generated by those customers.

44.     Defendants also had the opportunity and motive to inflate the number of Korean customers and the amount of revenue generated from those customers because defendants had acquired Bumil just before the start of the Class Period, knew its revenues from its non-Korean business were falling and wanted to make the Korean acquisition look like a success and an acquisition that would keep L&H's revenues growing despite the fall of its sales in the rest of the world.


## COUNT I

### (Against All Defendants Under Section 10(b) of the Exchange Act and Rule 10b-5)

45.     Plaintiff incorporates paragraphs 1 through 44 of this complaint as if fully set forth here.

-19-

46.     Each of the defendants: (a) knew or had access to material adverse non-public information about L&H's financial results and then-existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, conference calls, reports and other public representations of and about L&H.  For example, defendants knew the information provided to the public contained inflated and inaccurate figures regarding L&H's business and revenue from its Korean customers.

47.     During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order for the statements made, in the circumstances in which they were made, not to be misleading.

48.     Plaintiff's allegations are based on his thorough investigation, conducted through his attorneys, of all reasonably available sources of information, including, but not limited to, publicly available relevant information, in order to obtain information necessary to plead plaintiff's claims with particularity.  The nature and scope of plaintiff's efforts to obtain the information needed to plead with particularity included the following:

a.     Plaintiff undertook efforts to obtain and review L&H's filings with the SEC during the relevant time period, including, but not limited to, the Company's Form 10-K for the year ended 1999, the Company's 10-Q for the quarters ended December 31, 1999, March 31, 2000 and June 30, 2000;

2.     Plaintiff undertook efforts to obtain and review the Company's press releases and other publicly disseminated statements made by defendants during the relevant time period;

3.      Plaintiff undertook efforts to obtain and review reports, articles and discussions concerning the Company and the subject matter of this complaint contained in the print and electronic media and computer databases;

4.      Plaintiff undertook efforts to obtain and review reports of securities analysts and investor advisory services; and

49.      Except as alleged in this complaint, the underlying information relating to defendants' misconduct was not available to plaintiff and the public and lies exclusively within the possession and control of defendants and other insiders of L&H, thus preventing plaintiff from further detailing defendants' misconduct at this time.

50.      Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

1.      Employed devices, schemes and artifices to defraud;

2.      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which there were made, not misleading; or

3.      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchase of L&H common stock during the Class Period; and

4.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices to acquire L&H common stock.  Plaintiff and the Class would not have purchased L&H common stock at the price they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' materially misleading statements.

**COUNT II**

-21-

**(Against Defendant Bastiaens Section 20(a) of the Exchange Act)**

51.     Plaintiff incorporates paragraphs 1 through 50 of this complaint as if fully set forth here.

52.     The claim asserted against Bastiaens is based on § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

53.     Bastiaens acted as a controlling person of L&H within the meaning of § 20(a) of the Exchange Act.  By reasons of his position as a director and officer of L&H, Bastiaens had the power and authority to cause L&H to engage in the wrongful conduct described in this complaint.

54.     By reason of such wrongful conduct, Bastiaens is liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of his wrongful conduct, plaintiff and other members of the Class were damaged in connection with their purchase of L&H's stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(1) Appointing plaintiff to be a lead plaintiff under the PLRA and appointing his counsel as counsel for the Class;

(2)  Declaring this action to be a proper class action within the meaning of Fed. R. Civ. P. 23(a) and 23(b)(3) and declaring plaintiff to be a proper class representative;

(3) Awarding plaintiff and all members of the Class compensatory damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

(4) Awarding plaintiff and all members of the Class their costs and expenses incurred in this action, including reasonable attorney fees, together with expert witness fees and other costs; and

(5) Granting plaintiff and the Class such other and further relief as the court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  August 18, 2000

**BERMAN, DEVALERIO & PEASE**

By: _____

Michael Lange, BBO # 559372
One Liberty Square
Boston, Massachusetts 02109
(617) 542-8300
(617) 542-1194 (fax)

Andrew M. Schatz, Esq.
**SCHATZ & NOBLE, PC**
330 Main Street, 2nd Fl.
Hartford, CT 06106
(860) 493-6292

Mark McNair, Esq.
**LAW OFFICE OF MARK MCNAIR**
1819 Pennsylvania Avenue, N.W.
Suite 550
Washington, DC  20006
(202) 872-4717

Richard S. Wayne, Esq.
**STRAUSS & TROY**
The Federal Reserve Building
150 East Fourth Street
Cincinnati, OH  45202
(513) 621-2120

**Attorneys for Plaintiff**

## PLAINTIFF'S CERTIFICATION OF SECURITIES
## FRAUD CLASS ACTION COMPLAINT

I/We, _LARRY A. ROSENMANN_ hereby certify that the following is true and

correct to the best of my/our knowledge, information and belief:

      1.     I/We have reviewed the complaint filed against **Lernout & Hauspie Speech**

**Products N.V.** (the "Complaint"), and have authorized the filing of a complaint on my/our

behalf.

      2.     I am/We are willing to serve as a representative party on behalf of the class (the

"Class") as defined in the Complaint, including providing testimony at deposition and trial, if

necessary.

      3.     My/Our transaction(s) in **LHSP** common stock during the Class Period are as

follows:

| Trade Date | Number of Shares Purchased | Price Per Share |
|---|---|---|
| 4/4/00 | 15 | 91 3/4 |
| 5/8/00 | 15 | RECIEVED FROM STOCK SPLIT |
| | | |
| | | |
| | | |

| Trade | Number of | Price |
|---|---|---|

-26-

| Date | Shares Sold | Per Share |
|------|-------------|-----------|
|      |             |           |
|      |             |           |
|      |             |           |
|      |             |           |
|      |             |           |
|      |             |           |

4.      I/We did not purchase these securities at the direction of my/our counsel, or in order to participate in any private action arising under the Securities Exchange Act of 1934.

5.      During the three year period preceding the date of my/our signing this Certification, I/we have not sought to serve, nor have I/we served, as a representative to any party on behalf of a class in any private action arising under the Securities Exchange Act of 1934.

6.      I/We will not accept any payment for serving as a representative party on behalf of the Class beyond my/our pro rata share of any possible recovery, except for an award, as ordered or approved by the court, for reasonable costs and expenses (including lost wages) directly relating to my/our representation of the Class.

Signed under the penalties of perjury this *14* day of *August*, 2000.

26 DENVER DRIVE
WEST SAND LAKE NY 12196

-27-